under the facility and reduced Scient's borrowing limit to $1.1 million. On July 3, 2002, Scient borrowed the full $1.1 million under the facility.

14. As of the Petition Date, Scient had borrowed approximately $8.8 million under a term-loan facility with Inmark Capital ("Inmark"), which was later assigned to North Fork Bank, NA ("North Fork") (the "North Fork Loan"). Several directors and one large Scient shareholder, Robert Howe ("Howe"), personally guaranteed the North Fork Loan and provided cash collateral to North Fork to secure their guarantees in the approximate amount of $8.8 million.

### D. Events Precipitating the Chapter 11 Filings

15. Because the demand for e-services diminished dramatically, beginning in the third quarter of 2000, technology consultants, including Scient, experienced significant reductions in demand for their services. Many clients delayed implementing their e-business strategy because of changes in the economic climate. Moreover, many larger, traditional companies chose to use in-house resources to implement their e-business initiatives instead of outside technology consultants. Even worse, many of Scient's clients went out of business, leaving Scient with uncollectable accounts receivable. All in all, Scient's consolidated revenue, including the Debtors and non-Debtor affiliates, dropped from $189 million on a pro forma basis for the quarter ended September 30, 2000, to $21 million, with a net loss of approximately $5.3 million, for the quarter ended March 31, 2002.

16. Due to the fact that the demand for e-services consulting remained at low levels, beginning in late 2001 and early 2002, the Debtors took significant restructuring efforts to survive such adverse economic conditions and revenue declines by, among other things, including reducing staff levels, eliminating unneeded locations, and minimizing expenses.

\\ny-srv01\931213v07

### E.     Scient's Sale of Substantially All of Its Assets

17.     To overcome the industry and economic downturn, in February 2002, Scient began exploring strategic alternatives. Scient ultimately decided that a sale of its business was the only viable alternative because Scient could not obtain further financing and its restructuring and cost-reduction strategies were inadequate. In April 2002, Scient hired Capitalink LC ("Capitalink"), a Florida-based investment-banking firm, to assist with those activities.

18.     From April through July 2002, Capitalink and Scient met with various potential acquirers and their investment bankers, resulting in numerous offers, with several parties providing non-binding term sheets. Of these offers, the board of directors determined that the offer presented by SBI in late June 2002, was the highest and best offer.

19.     As a result, and facing a severe liquidity crisis, Scient entered into an Asset Purchase Agreement with SBI to sell substantially all of its assets in exchange for approximately $15,470,000 in cash, subject to certain adjustments, and subject to higher and better offers (the "SBI Sale").

### F.     Howe's Funding Commitment Agreement With SBI

20.     After the negotiation of the Asset Purchase Agreement with SBI, Howe, the Chairman of the Board of Scient, entered into a Funding Commitment Agreement with SBI, pursuant to which Howe agreed that any amounts he received from North Fork after payment of the North Fork Loan and the return of Howe's cash collateral would be invested in SBI.

21.     In return for Howe's investment, SBI agreed to issue Howe (a) a promissory note in the principal amount of $2.8 million, less fifty percent of the total amount paid to Debtors' unsecured creditors, but not to exceed $500,000; (b) a $3 million promissory note; and (c) $2 million in common stock of SBI Holdings, Inc. ("SBH"), the parent company of SBI. If Howe

received less than $7.8 million as a secured creditor in the Debtors' cases, then each element of the foregoing consideration would be reduced proportionately. The Debtors estimated that Howe would receive approximately three percent or less of the total outstanding common stock of SBH.

### G. DIP Financing

22. To preserve the value of the Debtors' business pending a sale of substantially all of the Debtors' assets, SBI also agreed to provide Scient with debtor-in-possession financing of up to $4.9 million pursuant to a DIP Financing Agreement (the "DIP Financing"). Under the DIP Financing, the DIP facility had to be repaid upon closing of the SBI Sale.

23. Because of the Debtors' dire financial difficulties and their need to implement the SBI Sale and the DIP Financing, the Debtors filed their chapter 11 cases on the Petition Date.

### H. The SBI Sale, Committee Investigation and Global Settlement

24. By order dated August 15, 2002, the Court established September 10, 2002, as the deadline for the submission of competing offers to acquire the Debtors' assets, with a hearing to approve the highest and best offer to be held on September 13, 2002. After the Petition Date, the Debtors and their financial advisors, Capitalink, extensively marketed the Debtors, met with numerous interested parties and provided access to financial information to certain interested qualified bidders. Unfortunately, no other party came forward with a competing bid.

25. The Committee undertook an extensive investigation of the SBI Sale, the North Fork Loan and Howe's agreement to invest any monies he recovered from North Fork with SBI under the Funding Commitment Agreement. The Committee, on a preliminary basis, also identified numerous potential causes of action against North Fork, Howe and other current and former directors of Scient. Although the Committee recognized that proving those potential

claims were difficult and such claims were subject to defenses, the Committee initially determined to pursue such claims.

26. On September 10, 2002, three days prior to the hearing to approve the SBI Sale, the Committee filed motions with the Bankruptcy Court seeking to surcharge North Fork's collateral under section 506(c) of the Bankruptcy Code for all costs, fees and expenses incurred with respect to the sale of the Debtors' assets and the maintenance of North Fork's collateral, as well as a motion for authority to commence an adversary proceeding against North Fork, as pre-petition lender, and the Debtors' current and former directors (the "Authority Motion"). Annexed to the Authority Motion was the Committee's draft complaint setting forth nineteen separate counts of various claims and causes of action against North Fork and the Debtors' current and former directors (the "Estate Claims"), including (i) claims based on breach of fiduciary duty, (ii) claims based on fraudulent conveyance theories, (iii) claims seeking equitable subordination, (iv) claims for conspiracy, (v) claims seeking to recharacterize and collapse the North Fork secured claim as an equity interest on the ground that the loan was in reality a loan from the individual director/guarantors, (vi) a claim challenging the extent, validity, perfection and enforceability of the claims and liens of North Fork, (vii) a claim for injunctive relief prohibiting further adequate protection payments to North Fork, (viii) a claim seeking disgorgement of adequate protection payments previously made to North Fork, (ix) claims seeking to avoid and recover alleged preferential payments, including not less than $2,135,485.03 plus interest from Howe, and (x) claims for injunctive relief prohibiting the return of Howe's cash collateral posted with North Fork upon consummation of the SBI Sale.

27. The Debtors questioned the viability of the Estate Claims, particularly in light of the cost, expense, delay and risks involved. After extensive (and often contentious) negotiations

among the Debtors, the Committee, Howe and SBI and the Committee's determination that prosecution of the Estate Claims may not lead to any meaningful recovery to unsecured creditors, a global settlement (the "Global Settlement") was reached pursuant to which (i) the Committee withdrew its objections to the SBI Sale and (ii) after consummation of the SBI Sale, and concurrently with the payment in full of North Fork's $8.8 million secured claim and the receipt by Howe and the other guarantors of the North Fork Loan of the cash collateral they provided to North Fork, Howe, as subrogee secured creditor, agreed to use the distribution on account of his collateral as a give-up to fund and agreed to pay (A) $3.65 million into an escrow fund in trust and for the benefit of pre-petition general unsecured creditors of the Debtors (the "Creditor Fund"), with such funds to be distributed to timely filed and allowed pre-petition unsecured creditors either (x) in accordance with a liquidating plan approved by the Court or (y) pursuant to further order of the Court, and (B) $250,000 to the Debtors for use for general corporate purposes, including the cost of administering these chapter 11 cases.

28. The Global Settlement specifically provided that the Creditor Fund is *not* property of the Debtors' estates and shall be held and distributed for allowed pre-petition creditors.

29. In addition to the monies the estates received from Howe in connection with the Global Settlement, the order approving the SBI Sale provided for an amendment to the Asset Purchase Agreement with SBI so that the Debtors' estates had the right to receive the net proceeds from the liquidation of a "basket" containing certain additional assets excluded from the Asset Purchase Agreement up to $500,000.

30. As a result of the Global Settlement, on September 13, 2002, the Court entered an order approving the SBI Sale. On September 19, 2002, the Debtors and the Committee filed a joint motion to approve the Distribution and Sharing Agreement. After notice and a hearing, the

Bankruptcy Court approved the Distribution and Sharing Agreement by order dated September 25, 2002. A copy of this order and the Distribution and Sharing Agreement is attached hereto as Exhibit A.

31. On September 30, 2002, the Debtors closed the SBI Sale. Under the SBI Sale, the North Fork loan of $8.8 million was repaid in full as well as the outstanding obligations on the DIP Financing facility. At closing, the Debtors received approximately $3.1 million representing $1.8 million of proceeds from the sale and $1.3 million of DIP Financing.

## RELIEF REQUESTED

32. The Debtors and the Committee respectfully request the entry of an order providing for the following relief:

- Authorizing the distribution of the proceeds of the Creditor Fund *pro rata* to holders of allowed and timely filed non-priority unsecured claims (the "Distribution").

- Approving the procedures (the "Procedures") that shall govern the Distribution. A copy of the Procedures is annexed hereto as Exhibit B.

- Authorizing the appointment of Howard Konicov of J.H. Cohn LLP as the Disbursing Agent to make the Distribution from the Creditor Fund.

- Authorizing the establishment of a disputed unsecured claims reserve (the "Disputed Unsecured Claims Reserve") for those unsecured claims which have not been allowed or are subject to dispute.

- Authorizing the pooling of the Debtors' assets and liabilities so that all holders of allowed unsecured claims will share in one common pool -- the Creditor Fund.

## ARGUMENT

**A.    The Distribution is Permissible Under the Bankruptcy Code**

33. Since the closing of the SBI Sale, the Debtors and the Committee have made significant strides in winding down their remaining affairs so that a plan could be filed and

confirmed. Among other things, the Debtors, with the Committee's support, have filed objections to approximately fifty-four administrative claims and have resolved practically all such claims, resulting in a reduction of administrative claims in the approximate amount of $5.5 million. The Debtors have objected to and resolved all priority wage claims against the Debtors. The Debtors, with the Committee's support, have objected to approximately fifteen priority tax claims and have resolved all such claims with the exception of approximately two claims which the Debtors anticipate resolving shortly. As a result of these efforts, approximately $5.8 million in priority claims have been eliminated. Lastly, the Debtors have undergone an extensive analysis of all unsecured claims and have worked closely with the Committee so the Committee could commence the process of objecting to general unsecured claims. Towards this end, the Committee, with the assistance of the Debtors, filed its first omnibus objection to unsecured claims and was successful in expunging, to date, approximately $21 million in unsecured claims. The Committee is now in the process of addressing and reconciling the remainder of the objections that were not resolved. While this process has started, the Debtors and the Committee anticipate that all objections to disputed unsecured claims will be resolved by March 2004.

34. The Debtors, with the Committee's support, have also aggressively pursued preference and other recovery actions. Given the Debtors' cash on hand, together with anticipated proceeds from recovery actions, the Debtors believe that they will be able to file and consummate a joint plan with the Committee to satisfy all administrative and priority claims. However, the filing of a joint plan and disclosure statement needs to be delayed because the Debtors and Committee estimate that it will take at least another six months to (A) realize sufficient proceeds from various recovery and preference actions so that the Debtors have

sufficient funds to satisfy all remaining priority claims which are estimated to be approximately $1.25 million and (B) reconcile the remaining objections to unsecured claims. Nonetheless, in light of the resolution of a significant number and amount of general unsecured claims and the fact that the Creditor Fund was established over a year ago to be held in trust <u>solely</u> to pay holders of allowed unsecured claims, either pursuant to an order confirming a plan or further order of the Court, there is no reason why the Distribution of the Creditor Fund should be further delayed.

35.  Under the Distribution and Sharing Agreement, $3.65 million was reallocated from the secured creditors to unsecured creditors and placed into trust solely for the benefit of holders of allowed pre-petition general unsecured claims. These funds are not property of the Debtors' estates as a matter law and therefore should be distributed to unsecured creditors.

36.  The Distribution does not violate or derogate from the provisions of the Bankruptcy Code for a number of reasons. First, as set forth above, these funds are not property of the estate as they are proceeds of the collateral of Howe, the Debtors' secured creditor, who agreed to reallocate or "carve-out" a portion of the proceeds of his collateral subsequent to the consummation of the SBI Sale, as memorialized in the Distribution and Sharing Agreement and the order approving such agreement. *See Official Unsecured Creditors' Committee v. Stern (In re SPM Mfg.Corp.)*, 984 F.2d 1305, 1312 (1st Cir. 1993); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 601 (Bankr. D. Del. 2001), *appeal dismissed sub nom. Grimes v. Genesis Health Ventures, Inc.*, 280 B.R. 339 (D. Del. 2002); see also *In re Hagerstown Fiber Limited Partnership,* 1998 Bankr. LEXIS 1054, at * 35 (Bankr. S.D.N.Y. 1998) (Bernstein, C.J.) ("bondholders can share the distribution of their secured claims with anyone they chose"); *In re Parke Imperial Canton, Ltd.,* 1995 Bankr. LEXIS 775, at * 9, n4 (Bankr. N.D. Ohio 1995)

("creditors are free to do what they w[a]nt with dividends, including sharing them with other creditors"). Second, since such funds are not property of the Debtors' estates, the distribution schemes of section 726, and by implication, the priorities of section 507 of the Bankruptcy Code do not come into play. *In re SPM Mfg. Corp.*, 984 F.2d at 1312. The distribution and priority schemes of the Bankruptcy Code were not triggered because the sharing between Howe and the general unsecured creditors occurred <u>after</u> the proper distribution of estate property to Howe. Thus, although a debtor and/or a trustee may not pay non-priority creditors ahead of priority creditors, "creditors are generally free to do whatever they wish with the bankruptcy dividends they receive, *including to share them with other creditors.*" *Id.* at 1313 (emphasis added).

37.    Moreover, while section 726 and other provisions of the Bankruptcy Code governing the priorities apply to distributions of property of the estate, such provisions do not govern the rights of creditors to transfer or receive non-estate property. *Id.*; *see also In re Mcorp Fin. Inc.*, 160 B.R. 941, 960 (Bankr. S.D. Tex. 1993) (senior creditor shared the proceeds of its collateral with a junior creditor pursuant to an agreement whereby other junior creditors were not included in the agreement); *In re American Res. Mgmt. Corp.*, 51 B.R. 713 (Bankr. D. Utah 1985) (stipulation whereby secured creditor holding a senior lien on all assets of the debtor's estate agreed to allow a designated amount of its cash collateral to be used for the payment of the fees of the trustee's attorney and accountants, but not for the payment of the fees of the creditors' committee professionals did not subvert the Bankruptcy Code's statutory scheme of priorities nor defeat its twin policies of debtor rehabilitation and fairness to creditors).

38.    For these reasons, this Court should approve the Distribution of the proceeds of the Creditor Fund to the holders of allowed unsecured claims as such course of action simply

implements the terms of the Global Settlement, which were memorialized in the Distribution and Sharing Agreement and approved by this Court.

**B.    Proposed Distribution**

   **1.    Procedures**

Attached hereto as <u>Exhibit B</u> are the proposed Procedures that shall govern the Distribution. An overview of the proposed Procedures follows:

   **a.    Total Available Cash for Distribution to Unsecured Creditors**

39.    The Creditor Fund contains approximately $3.65 million.

40.    As of the date hereof, the Debtors and the Committee estimate that the filed and scheduled general unsecured claims total approximately $33 million. Of that amount, approximately $8.5 million are in dispute and the subject of the Committee's first omnibus objection to unsecured claims. Under the terms of the Distribution and Sharing Agreement, the Debtors and the Committee estimate that the unsecured creditors will receive *pro rata* distributions from Creditor Fund of between 10.0% and 14.0% of their allowed claims. Also, the Committee will reserve $150,000 to cover potential administrative and distribution costs and expenses of the Committee's professionals incurred in connection with the Distribution.

   **b.    Disbursing Agent**

41.    The Committee seeks authorization to retain Howard Konicov of J.H. Cohn LLP, accountants and financial advisors to the Committee, as the Disbursing Agent to make the Distribution from the Creditor Fund. The Disbursing Agent's tasks will include, among other things, preparing and mailing the distribution checks to all holders of allowed unsecured claims from the Creditor Fund and handling communications with such holders in connection therewith.

### c. Establishment of Disputed Unsecured Claims Reserve

42. In connection with the Distribution from the Creditor Fund, the Debtors and the Committee seek authorization for the establishment of a Disputed Unsecured Claims Reserve account into which will be deposited a sufficient amount of funds to be distributed on account of the face amount of each disputed claim that has not become an allowed claim as of the Distribution Record Date (as defined below) calculated as follows: (a)(1) the total of all disputed unsecured claims as of the Distribution Record Date, divided by (2) the total amount of all unsecured claims, including allowed and disputed unsecured claims, multiplied by (b) the total amount of cash available for Distribution of the Creditor Fund as of the Distribution Record Date.

43. In addition, the Debtors and the Committee seek the following relief with respect to the Disputed Unsecured Claims Reserve:

(i) Any payment made to the holder of an allowed unsecured claim which was previously a disputed claim from the Disputed Unsecured Claims Reserve shall not include any accrued interest. The Disputed Unsecured Claims Reserve shall be terminated upon the filing with the Bankruptcy Court of a written certification (the "Certificate of Distribution") that all distributions required to be made from the Disputed Unsecured Claims Reserve have been made in accordance with the terms of this Motion. Such written certification shall be filed with the Court by the Committee and/or the Disbursing Agent within fifteen days of the satisfaction of the condition set forth in the immediately preceding sentence.

(ii) No distribution or payment shall be made on account of a disputed unsecured claim unless or until such disputed unsecured claim becomes an allowed unsecured claim by final order of the Court.

(iii) On the first distribution date and each subsequent distribution date, the Disbursing Agent shall make distributions of any funds reserved for any disputed unsecured claim that has become an allowed unsecured claim since the prior distribution date to the holder of such allowed unsecured claim. Any distributions held in the Disputed Unsecured Claims Reserve for the benefit of a holder of a disputed unsecured claim which is subsequently disallowed, in whole or in part, shall be distributed, on the next succeeding distribution date, to the holders of allowed unsecured claims in accordance with the terms of this Motion as if such amounts had been distributed on the first distribution date.

### d.    Procedures with Respect to Unclaimed Distributions

44. In connection with the Distribution, the Debtors and the Committee anticipate that certain holders of allowed unsecured claims will fail to negotiate distribution checks and/or certain distribution checks will be returned to the Committee or its Disbursing Agent for various reasons, including (a) an incomplete or inaccurate address for a claimant, (b) to the extent that a claimant is a corporation or partnership, such claimant has dissolved or gone out of business, or (c) a claimant has moved without leaving a forwarding address or the forwarding address instructions with the post office have expired. The Debtors and the Committee propose that the following procedures be applied to address distribution checks that are not negotiated or are returned to the Disbursing Agent:

(i) If a holder of an allowed unsecured claim fails to negotiate a distribution check issued to such holder, pursuant to the provisions of the proposed distribution order, on or before thirty days of issuance of such distribution check, then the Committee and/or the Disbursing Agent shall provide written notice to the holder of such allowed claim advising such holder that unless the distribution check is deposited within sixty days after the date of such

notice (i) the Disbursing Agent shall cancel such distribution check, (ii) the amount of cash attributable to such check shall be deposited in the Creditor Fund, and (iii) the holder of such allowed unsecured claim automatically shall be deemed to have waived its allowed unsecured claim. If such holder fails to negotiate such holder's distribution check or contact the Committee or the Disbursing Agent in writing within such sixty-day period after the date of the notice, then the amount of cash attributable to such check shall be deposited in the Creditor Fund, and the payee of such check automatically shall be deemed to have waived its allowed claim. If a holder of an allowed unsecured claim contacts the Committee or the Disbursing Agent in writing within such sixty- day period, the Disbursing Agent will re-issue a distribution check to such holder at the end of the sixty-day period and such holder will be informed that the distribution check must be cashed within thirty days of reissuance of such distribution check or (i) the Disbursing Agent shall cancel such distribution check, (ii) the amount of cash attributable to such check shall be deposited in the Creditor Fund, and (ii) the holder of such allowed claim automatically shall be deemed to have waived its allowed unsecured claim.

(ii)  If a distribution check representing the Distribution to any holder of an allowed unsecured claim is returned to the Disbursing Agent or the Committee, then the Committee shall re-send such distribution check to the holder of such unsecured claim. If such distribution check is again returned to the Committee or the Disbursing Agent, such check shall be held by the Committee until the date which is ninety days from the date of the check and if the holder of the respective unsecured claim does not contact the Committee or the Disbursing Agent in writing within such ninety-day period from the date of the check, (i) the Disbursing Agent shall cancel such distribution check, (ii) the amount of cash attributable to such check shall be deposited in the Creditor Fund, and (iii) the holder of such allowed claim automatically shall be

\\ny-srv01\931213v07

deemed to have waived its allowed unsecured claim. If the holder of an allowed unsecured claim contacts the Committee or the Disbursing Agent in writing within such ninety-day period from the date of the check, the Disbursing Agent will re-issue a distribution check to such holder and such holder will be informed that the distribution check must be cashed within thirty days of the date of such reissued distribution check or (i) the Disbursing Agent shall cancel such distribution check, (ii) the amount of cash attributable to such check shall be deposited in the Creditor Fund, and (iii) the holder of such allowed unsecured claim automatically shall be deemed to have waived its allowed unsecured claim.

(iii) The Committee shall have no obligation to send distribution checks to the holder of allowed unsecured claims who have provided no address or whose address has previously proven to be undeliverable or whose distribution is less than $100.00. Further, in the event that a second distribution is made as set forth below, the Committee shall have no obligation to send distribution checks to holders of allowed unsecured claims who are deemed to have waived their claims in accordance with the procedures set forth in subparagraphs (ii)(a) and (ii)(b) above. Holders of allowed unsecured claims who have not provided the Debtors, the Committee or the Disbursing Agent with an address or who not notified the Debtors or the Disbursing Agent of a change of address shall be deemed to have waived their claims.

e. **Establishment of Distribution Record Date**

45. The Debtors and the Committee have requested in the proposed order that February 25, 2004 be fixed as the record date (the "Distribution Record Date") for purposes of determining the holders of allowed unsecured claims entitled to receive a Distribution from the Creditor Fund.

46. The proposed order also provides that the Committee is required to make the Distribution to the entity which is shown on the official claims register maintained by the Claims Agent, Bankruptcy Services LLC, pursuant to Bankruptcy Rule 5003(b) (the "Claims Register"), as the holder of an allowed unsecured claim as of the Distribution Record Date. The Debtors and the Committee request that the Committee and the Claims Agent be authorized not to accept any new or amended unsecured claims or transfers of such claims after the Distribution Record Date.

47. Finally, the proposed order provides that for purposes of making the Distribution, the Committee and the Disbursing Agent are authorized to rely upon the Claims Register as it exists on the Distribution Record Date.

48. The Committee will file with the Court and serve upon counsel for the Debtors and the Office of the United States Trustee prior to the Distribution Record Date a Certificate of Distribution confirming that the Distribution was made by the Committee within fifteen days of completion of the Distribution. Further, in the event that a subsequent Distribution is required, the Committee shall file and serve upon counsel for the Debtors and the Office of the United States Trustee a subsequent Certificate of Distribution.

      **f.**    **Pooling of Debtors' Assets for Purposes of Making the Distribution**

49. In connection with the Distribution, the Debtors and the Committee respectfully request the following ancillary relief.

      (i) Solely for purposes of making the Distribution, the Debtors and the Committee request that the assets and liabilities of the Debtors be pooled and consolidated. The pooling and consolidation of the Debtors' assets and liabilities will enable the assets and liabilities of the four Debtors to be pooled so that all of the holders of unsecured claims may share in the common pool. If the Debtors' estates were not consolidated, it would be necessary

for the Debtors and the Committee to allocate the Creditor Fund in an arbitrary fashion, to review each unsecured claim, determine which entity among the Debtors is the proper Debtor against which such claim should be asserted, file a motion to expunge the claim and/or have the claim deemed to have been filed against the appropriate Debtor entity and make different distributions to each holder of an unsecured claim with each such claimant receiving a Distribution from the Debtor with which the particular claimant conducted business. In addition to the benefits to the estates in avoiding the costs and delays involved in accomplishing these tasks, consolidation of the Debtors' estates solely for the purposes of the Distribution is necessary because the Debtors have operated as a single business enterprise and have no reliable or reasonable means of separating their assets and liabilities by individual Debtor. Moreover, the Debtors believe that a majority of the holders of unsecured claims would similarly be unable to identify the particular Debtor with which they conducted business.

        (ii)    Consequently, to assist the Debtors and the Committee in making the Distribution in an efficient and cost-effective manner, the Debtors and the Committee request that on the date of entry of the proposed order approving the Procedures for purposes of making the Distribution only (i) all assets (and all proceeds thereof) and liabilities of all of the Debtors (other than Scient) be deemed pooled or treated as though they were merged into and with the assets and liabilities of Scient, (ii) no distributions shall be made on account of inter-company claims among the Debtors and all such claims shall be eliminated, (iii) all guarantees of the Debtors of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any liability of any of the Debtors and any guarantee thereof executed by any other Debtor and any joint or several liability of any Debtor shall be deemed to be one obligation of the consolidated Debtors, (iv) each and every claim filed in any of the chapter 11 cases shall be

deemed filed against the consolidated Debtors and shall be deemed one claim against and obligation of the consolidated Debtors and (v) for purposes of determining the availability of the right of set-off under section 553 of the Bankruptcy Code, the Debtors shall be treated as one entity so that, subject to the other provisions of section 553 of the Bankruptcy Code, debts due to any of the Debtors may be set-off against the debts of any of the other Debtors.

## **NOTICE**

50.     Notice of this Motion will be given to (i) all creditors, including all taxing authorities, and holders of priority claims, (ii) the Office of the United States Trustee, 33 Whitehall Street, New York, New York 10004 (Attention: Richard C. Morrissey, Esq.), (iii) counsel to the Committee, Arent Fox Kitner Plotkin and Kahn, PLLC, 1675 Broadway, New York, New York 10019 (Attention: Andrew I. Silfen, Esq.), and (iv) all persons who have filed a notice of appearance and request for notice in these cases by regular first class, United States Mail, postage prepaid.

51.     Because this Motion does not present any novel issues of law, the Debtors and the Committee respectfully request that the Court waive the requirement set forth in LBR 9013-1(b) that a separate memorandum of law be filed in support of this Motion. The Debtors and the Committee reserve the right, however, to further address the Motion and other ancillary issues and respond to any party either by further submissions to this Court, at oral argument or testimony to be presented at any hearing.

52.     No previous request for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Debtors and the Committee seek an order, substantially in the form annexed as <u>Exhibit C</u>, authorizing the Distribution of the funds held in trust in the Creditor Fund for the benefit of unsecured creditors, establishing the distribution procedures described in the Motion, and granting the Debtors and the Committee such further relief as is just and proper.

Dated: New York, New York
       January 23, 2004

                    GREENBERG TRAURIG, LLP
                    Attorneys for the Debtors and
                    Debtors-in-Possession

                    By: /s/ Howard J. Berman
                        Howard J. Berman (HB-4151)
                        200 Park Avenue
                        New York, New York 10166
                        (212) 801-9200


                    ARENT FOX KINTNER PLOTKIN & KAHN, PLLC
                    Counsel for the Official Committee
                    of Unsecured Creditors

                    By: /s/ Andrew I. Silfen
                        Andrew I. Silfen (AS-1264)
                        Leah M. Eisenberg (LE-0096)
                        1675 Broadway, 25th Floor
                        New York, New York 10019
                        (212) 484-3900

# EXHIBIT C